**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN  DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 25-CR-00448-001 |
| | ) | |
| MEGAN KYLIE ROBINSON, | ) | |
| Defendant. | ) | |

**DEFENDANT ROBINSON'S**
**SENTENCING MEMORANDUM**

COMES NOW Megan Robinson, through counsel, Marna Franklin, and hereby submits this Sentencing Memorandum pursuant to LCrR 32.6, addressing the statutory factors set forth in Title 18, United States Code, §3553(a), as they relate to a fair and just sentence in the case. The primary directive in Section 3553(a) is for sentencing courts to impose a sentence sufficient, but not greater than necessary.   The Presentence Investigation  Report  has  set  forth  a  proposed  guideline  of imprisonment of 360 months.  Ms. Robinson  hereby respectfully requests the Court sentence her to such a term of imprisonment for 300 months, and in support, offers the following information for the Court's consideration:

To elaborate further regarding the Offender Characteristics of Megan Kylie

1

Robinson ("Megan") as set forth in Part C of the PSR, was born to her mother Brandi Palmer and father Michael Robinson. The memories of her father are limited to her early childhood, to when he had an altercation with the police that resulted in her parents' separation. According to Megan, her father Michael was a consumer of both alcohol and drugs; a review of his criminal history suggests that to be true. Her mother also believes that Michael was bipolar. When her mother would leave her alone with her father, Megan witnessed his frequent intoxication and drug use. The arguments between her parents often escalated beyond verbal, with her father exhibiting violence by punching holes in the walls. Notwithstanding the violence, Megan's young heart was broken when he would get paid from his job, pack an overnight bag, and walk out of the door. As a child, she blamed herself for his absence. The feelings of abandonment and being afraid of her father run deep, and the emotional trauma of witnessing him almost being shot by police continue to haunt her to this day.

Due to her father's habits, Megan and her mother were often left alone. They had to move frequently because her father would often leave them without financial support to pay rent. When her parents ultimately separated, her mother's cerebral palsy limited the household income to that of SSI. They simply could not afford to live on their own,

and had to rely on extended family for housing.    Megan and her mother started living at her grandma and step-grandpa's house, along with various aunts, uncles and cousins. Just when Megan finally felt as if she had a father figure in her life, she became aware of his inappropriate and violating behavior, and then her trust and love given to him was also lost.

The PSR sets forth in detail the various forms of sexual abuse that was normalized by Megan's male family members.    (See PSR, paragraphs 62, 64)    As a teenager, she experienced a sexual assault committed by a stranger.  (PSR, paragraph 66)   After that assault, in which a rape kit was obtained, and despite her physical injuries, there was no prosecution nor sympathy after her victimization.   Undoubtedly, Megan has unresolved trauma from those experiences, and the lack of therapy and treatment from her adverse childhood experiences could have influenced her behavior in the case at bar.

Throughout her life, there has never been a time that Megan didn't serve as a caregiver.    For her mother, she assisted daily in her needs for assistance in bathing and dressing.    For her uncle with Down syndrome, she would supervise and then after he was unable to care for himself due to being bedridden with dementia, she would assist in his care as well.

During the birth of Megan's first child, there were complications.  The epidural needle was misplaced, which resulted in nerve and disc damage to her back.    She was later prescribed Tramadol for her pain, and as with many individuals, an addiction to the narcotic set in.  When her prescription was empty, her daughter's father would get various additional pain medications from the street: Roxy's, Percocet, and Loratabs.    In addition to her own complications, the birth of Megan's premature (29 weeks), and he exhibited a genetic disorder that has required therapy, ongoing medical treatment and appointments, and gastrointestinal issues since he was born.    After the birth of their second child,  the relationship with her children's father ended after she discovered him cheating.    After her street supply of narcotics for her addiction was lost, she was introduced to "kratom"---a substance found readily in convenience stores.  It was not the same, but it did meet her addiction needs. (See Exhibit 1, QuickMD publication regarding various states banning the substance; there is no mention of Oklahoma attempting to take action in regulating the use or sale of the substance) By May of 2023, she was living in Moore with her mother and two children, and due to her son's disability, could not hold any sort of real job to generate income to sustain her addition. At this time, Megan described herself as being depressed and lonely,  and she "hated

4

herself."

As noted in the PSR, the offense of conviction came to light first from the investigation into the Snapchat activities of Shams Rehman in Arizona. The detailed complaint initially filed against Rehman references not only his solicitation of images from Megan, but from an adult woman living in Kentucky with her 2-year-old son. (25-cr-04780-AMM-BGM, Doc. 3) A supplemental filing further alleged that Rehman was also communicating inappropriately with a 13 year old girl, and enticed her to create and send sexually explicate videos of herself with her dog. (25-CR-04780-AMM-BGM, Doc. 18, pages 3-4) Additionally, Rehman posed as a 15 year old while communicating with an 11 year old, and was able to entice her to send sexually explicate photographs of herself. Doc. 18, Pages 4-5) . Rehman also posed as a 16 year old, and enticed an alleged 12 year old to send photographs of a child's vagina. (Doc. 18, page 5). Another female, who identified as being 15 years old, was asked by Reham to send photos of her "ass or pussy." Another female, only identified by a Snapchat username, sent Rehman five videos of a young female masturbating. (Doc. 18, page 5). Further information establishes Rehman's high intelligence, in that at the time of his arrest, he was employed as a pharmacy resident at Tucson Medical Center. Since the disclosure of the Final PSR

in the case at bar, Rehman's anticipated guilty plea has been set for June 8. 2026.

While Megan's offense conduct cannot be excused, the fact is that even as an adult, at the time of her offense, Megan was a vulnerable individual.    She had a history of sexual abuse, low self-esteem, high demands from her children, feeling of rejection and the cheating of her children's father, all in addition to a severe drug addiction and no financial means to support it.    In an effort to attempt to put her offense into context, Megan has written:

> "*I know for a fact if I wasn't on those pills this crime would have never happened and we wouldn't be here today.  My mental health along with the pills clouded my mind and judgement.  I will never forgive myself for the crime and for taking my childrens mother away from them.  Through CCDC[1] I am working on my trauma from my dad, my sexual assaults from my childhood and trying to heal open wounds that affected me to this day.*"

Further insight as to the circumstance of the commission of the offense has been provided by her mother, Brandi Palmer;

> "*I truly belive that the consumption of Kratom had altered my daughter state of mind.  She was taking up to half a bottle a day if not more, when I found out.   Taking Kratom caused her to be a unemotionally person, not caring who she hurt in the process to get her fix.   Megan was always a loving daughter and always helping people, she was a motivated and had plans to start a career until she started using.   She had a traumatic first pregnancy and delivered a premie baby with a disablites.  I think she sufferd from postpardon too.   That never got*

---

[1] Cleveland County Detention Center

*diagnose. She loved her kids and never wanted to yell or discipline them. She was always doing everything to protect them. Making sure they went to ever doctor appointment. But she never took time to get her health look at. I believe my daughter was a good person that had made a very bad decision for drugs, that got ahold of a very manipulative person that brainwashed her for his pleasure that she had lost all control of reality."*

In anticipation of sentencing, a number of Megan's family members have written letters for the Court's sentencing consideration:

-Debra Palmer, Megan's grandmother; (Exhibit 2)

-Misti Palmer, Megan's aunt; (Exhibit 3)

-Shawna Stephens, Megan's great aunt; (Exhibit 4)

-Charles Minard, Megan's great uncle; (Exhibit 5)

-Brandi Palmer, Megan's mother.  (Exhibit 6).

### ***REQUEST FOR INDIGENCY FINDING***

In the PSR, the writer indicates that in consideration of Megan's limited financial asset and liabilities, it appears that she may not have an ability to pay a fine.  (PSR, paragraphs 80-83)  Due to her current financial condition and the extremely limited earning capacity during her anticipated term of incarceration, it is requested that the Court find Megan to be an indigent person excluded from the

7

$5,000 assessment pursuant to 18 U.S.C.§ 3014.   If the Court were to deny this finding, the Court would be urged to consider either suspension of payment until after Ms. Robinson's release from imprisonment, or otherwise limit the garnishment of her imprisonment earnings to not more than 10% of her quarterly earnings so that she would be able to meet her personal hygiene needs during her term of imprisonment.

### *CONCLUSION*

Defendant Megan Robinson is 27 years old and has had no criminal history. While undoubtedly her criminal conduct is extremely serious,   a guideline sentence would be greater than necessary given her personal history and the context of her conduct.    The requested federal term of imprisonment of 300 months, would be sufficient to satisfy all of the purposes of sentencing consistent with §3553(a).   It is further requested that once any term of supervised release commences, that she be permitted to attempt to reconcile with her children on their terms, if they are agreeable, without the Court's prohibition.

### **PRAYER**

8

WHEREFORE, the Defendant Megan Robinson prays that the Court sentence her to the term of incarceration of 300 months and find her excludable from the statutory assessment pursuant to 18 U.S.C. § 3014.

Respectfully Submitted,

*s/Marna   Franklin*
Marna Franklin, OBA No. 17148
620 N. Robinson, Suite 203
Oklahoma City, OK 73102
(405) 239-2454 Telephone
(405) 212-5063 Fax
**Attorney  for  Megan    Robinson**

### CERTIFICATE OF SERVICE

I hereby certify that on  June 5, 2025, I sent a copy of the foregoing motion and exhibits filed by filing through ECF to the following:

Brandon Hale,
Assistant United States Attorney.

*s/Marna Franklin*
Marna Franklin

9